IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SUNFIELD ENTERPRISE CORPORATION,<br>      Plaintiff,<br><br>v.<br><br>SAPPHIRE AUDIO, LLC,<br>      Defendant | Civil Action No. 05-CV-685<br><br><br>Demand for Jury Trial |

**PLAINTIFF SUNFIELD ENTERPRISE CORPORATION'S
AMENDED COMPLAINT AGAINST SAPPHIRE AUDIO, LLC**

Plaintiff, Sunfield Enterprise Corporation ("Sunfield"), by and through its undersigned counsel, for its Amended Complaint against Sapphire Audio, LLC ("Sapphire"), a Delaware limited liability company, alleges as follows:

**PARTIES**

1.    Sunfield is a Taiwanese based company located at 14 Fl, No. 30, Chung Cheng 2nd Road, Kaohsiung, Taiwan, R.O.C. with its principal place of business in the Shenzhen area of China.

2.    On information and belief, Sapphire is a Delaware Limited Liability Company with its principal place of business in Boston, Massachusetts. Sapphire's registered agent for service is the Corporation Trust Company located at Corporation Trust Center, 1209 Orange Street, Wilmington, DE, 19801.

## JURISDICTION AND VENUE

3.  This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because the parties' citizenship is diverse and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.  This Court has personal jurisdiction over defendant Sapphire because it is a limited liability company organized under the laws of the State of Delaware.

5.  This District is a proper venue pursuant to 28 U.S.C. § 1391(a) because, as a Delaware limited liability corporation, defendant resides in this District.

## FACTS

6.  Sunfield is a consumer electronics company that primarily manufactures speakers for the consumer market place.

7.  Sapphire holds itself out as a supplier of home entertainment products to the consumer market.

**Unpaid Purchase Orders -- Speakers**

8.  In the summer of 2004, Sunfield was already manufacturing and selling a line of audio speakers to Sapphire. At that time, Sapphire informed Sunfield of its desire to update its line of speakers by, in part, modifying the circuit board used in the speakers.

9.  A Sapphire engineer worked with Sunfield, at Sunfield's facility, to build samples of the new speakers. Those efforts were photographed, in order for Sunfield to better learn the modifications Sapphire desired to the speakers.

10. Based upon Sapphire's descriptions of the product modifications it desired and the photographs of sample speakers built by Sunfield working with Sapphire's engineer, in

August, 2004 Sunfield produced and showed to Sapphire drawings detailing the new circuit board to be manufactured.

11.     Sapphire reviewed Sunfield's drawings and confirmed that they accurately portrayed the modified circuit board Sapphire wanted to incorporate in its new speakers.

12.     Sunfield manufactured pilot samples of the new circuit boards. Sapphire inspected those pilot samples and approved the speakers for further production.

13.     Sunfield manufactured additional speakers ordered by Sapphire consistent with the pilot speakers inspected and approved by Sapphire. Sapphire's personnel visited Sunfield's factory in Shenzhen, China from time to time, during the fall and winter of 2004 - 2005, and conducted numerous onsite inspections of the speakers being manufactured for Sapphire by Sunfield. Despite all of those in sections, Sapphire did not identify any problem with Sunfield's design or manufacture of the speakers.

14.     Sapphire employed SGS, Inc. ("SGS") as its agent to inspect the speakers manufactured by Sunfield before each and every shipment. SGS holds itself out as one of the world's leading inspection, verification, testing and certification companies.

15.     On or about September 20, 2004, Sunfield shipped the ten pilot samples to Sapphire for its approval. Sapphire did not raise any question as to defects with the samples and issued purchase orders to Sunfield immediately thereafter. Sunfield then started mass production according to the design of the pilot samples.

16.     On or about October 8, 2004, the first shipment of speakers were shipped by Sunfield to Sapphire. Sapphire's agent SGS inspected the speakers prior to Sapphire's accepting them for purchase and shipment F.O.B. Hong Kong. Sapphire raised no objection to the design or manufacture of the speakers after the pre-shipment inspection, or even after the speakers were

BOS_501597_2

received by Sapphire in the United States and subjected to whatever additional quality control or inspection process utilized by Sapphire. Sapphire accepted and paid for the speakers shipped on October 8, 2004.

17. Over the next several months, Sapphire issued purchase orders for additional speakers similar to the speakers shipped on October 8, 2004. Attached hereto as Ex. A and incorporated herein by reference, is a chart listing all of Sapphire's purchase orders for those speakers, and the amounts due from Sapphire on those purchase orders.

18. For each and every shipment of speakers to Sapphire in response to the purchase orders listed in Ex. A, SGS's corresponding inspection report indicates "no defect." Attached hereto as Ex. B, and incorporated herein by reference, are true and accurate copies of SGS's inspection reports as provided to Sunfield. On information and belief, SGS provided copies of all of these inspection reports to Sapphire prior to, or at the time of, shipment of the speakers F.O.B. Hong Kong.

19. Based on SGS's inspections, Sapphire accepted delivery of all speakers shipped by Sunfield to Sapphire F.O.B. Hong Kong.

20. On or about May 18, 2005, approximately seven months after the first full order of speakers was shipped to and accepted by Sapphire, Sapphire purported to raise an objection to the design or manufacture of the speakers. Specifically, Sapphire stated that the circuit board was incorrectly wired, such that the MKII board was attached to the tweeter driver, instead of the midrange driver, causing distortion in the sound at 7000Hz.

21. Wiring the circuit board such that the MKII board was attached to the tweeter driver was consistent with the design drawings reviewed and approved by Sapphire in August 2004.

BOS_501597_2

22. The purported design "defect" complained of by Sapphire in May 2005 could be detected simply by listening to the speaker or testing the frequency response of the speaker.

23. Sapphire accepted all of the speakers already shipped and Sunfield was not obligated to share the purported "repair" costs of the speakers it had received. Nevertheless, on or about May 18, 2005, Sunfield offered to share the anticipated reasonable costs of the "repairs" as a gesture of goodwill and a matter of good customer service, so long as the repairs would be performed at Sunfield's factory in China. Sunfield reasonably calculated that it could accomplish the repairs at a total cost of approximately $30,000. Sunfield informed Sapphire that an attempt to complete rewiring of the speakers in the United States would be unreasonably expensive.

24. On or about May 23, Sunfield notified Sapphire that the materials to complete the repairs on the speakers previously shipped to and accepted by Sapphire would be ready by June 1. Further, Sunfield notified Sapphire that it had already begun rework, completely at the expense of Sunfield, of all stock associated with purchase orders for which product had not been shipped that was still at the Sunfield factory, and that the rework of the stock would be completed by June 1.

25. On or about May 23, Sunfield made demand that Sapphire pay outstanding accounts receivable on various purchase orders dated April 16 through May 14 for which the product was inspected, accepted, shipped and received without rejection by Sapphire.

26. On or about May 23 and 24, Sapphire rejected Sunfield's repeated offers to rework the previously accepted speakers and, instead, informed Sunfield that Sapphire itself would conduct purported "repairs" in the United States at considerable cost, which Sapphire estimated at $150,000.

BOS_501597_2

27. On or about June 3, 2005, Sapphire suggested to Sunfield that the alleged "repair" cost Sapphire had run up after refusing Sunfield's offer to rework the speakers already shipped and accepted could be as high as $200,000.

28. Between April and May of 2005, Sunfield sent Sapphire a six invoices, amounting to a total of $142,367.27, for speakers inspected by SGS, shipped to and accepted by Sapphire which Sapphire has refused to pay.

29. Sunfield possesses in its factory additional speakers and related inventory produced in order to satisfy Sapphire's remaining purchase orders. At all material times, Sunfield had been ready, willing and able to perform in response to those purchase orders, but Sapphire has wrongfully refused to honor shipment of the remaining speakers. Sunfield has spent at least $144,425.56 in material and labor costs performing on these purchase orders to date.

30. Sapphire owes Sunfield over $500,000 on purchase orders for the speakers that it has wrongfully refused to honor.

**Unpaid Purchase Order -- Subwoofers and Related Stock**

31. On May 24, 2004 Sapphire issued purchase order 52401 for the development of new test products, including subwoofers and related stock.

32. Sunfield performed its obligations under the purchase order and manufactured pilot samples in accordance with Sapphire's specifications. The parties expected and agreed that Sunfield would be compensated for its efforts.

33. After receiving the pilot samples, Sapphire decided not to go forward with the products. Sapphire affirmed its agreement to reimburse Sunfield for the expenses it incurred performing under the purchase order. Those expenses total $31,462.94.

34. Despite demand from Sunfield, Sapphire has failed or refused to make good on its agreement to reimburse Sunfield for the expenses it incurred in performing under the purchase order for subwoofers and related products.

## COUNT I – BREACH OF CONTRACT (SPEAKERS)

35. Sunfield incorporates by reference the allegations set forth in paragraphs 1 through 34 as if set forth here in their entirety.

36. Sapphire's refusal to pay for the speakers inspected and approved by SGS and shipped to and accepted by Sapphire constitutes material breach of contract and as such Sunfield is entitled to $142,367.27 plus interest and any incidental damages pursuant to U.C.C. 2-709(1)(a).

37. Sapphire's repudiation of its additional purchase orders and refusal to pay for the speakers that it contracted for but refused delivery of -- despite the fact that Sunfield timely assured that the MKII board was attached to the midrange driver, as Sapphire stated it preferred in May 2005 -- constitutes a material breach of contract. As a result of Sapphire's breach, Sunfield has suffered out of pocket expenses of, at least, $144,425.56, and is entitled to recover its lost profits, plus interest.

38. Sunfield has fully performed its obligations under the parties' contract and purchase orders, or, at all material times, was ready, willing and able to perform all of its obligations. To the extent that any Sunfield obligations were not performed, they are only the obligations that Sapphire, by its breaches, prevented Sunfield from performing.

39. Accordingly, Sapphire is liable to Sunfield in the full amount of damages Sunfield may suffer arising out Sapphire's breach of contract, including any incidental and consequential damages arising from the breach.

## COUNT II – BREACH OF CONTRACT (SUBWOOFERS AND RELATED STOCK)

40. Sunfield incorporates by reference the allegations set forth in paragraphs 1 through 39 as if set forth here in their entirety.

41. Sapphire's refusal to reimburse Sunfield for the expenses it incurred in performing under Sapphire's purchase order for new test products, including subwoofers and related stock, constitutes a material breach of contract.

42. Sunfield fully performed all of its obligations under the parties' contract, or, at all material times, stood ready, willing and able to fully perform all of its obligations. To the extent that any Sunfield obligations were not performed, they are only the obligations that Sapphire, by its breaches, prevented Sunfield from performing.

43. As a result of Sapphire's breach, Sunfield has been damages in the amount of $31,462.94, plus interest and any incidental and consequential damages arising from the breach.

## COUNT III – UNJUST ENRICHMENT

44. Sunfield incorporates by reference the allegations set forth in paragraphs 1 through 43 as if set forth here in their entirety.

45. Sapphire has been unjustly enriched by its acceptance of speakers produced by Sunfield, and Sunfield's additional production of speakers, subwoofers and related stock at Sapphire's request, upon the reasonable expectation that Sapphire would pay for those products. Accordingly, Sunfield is entitled to recover its damages, including the fair market value of all product delivered to Sapphire, and all stock and related equipment purchased by Sunfield in order to perform on Sapphire's purchase orders, plus interest.

## COUNT IV – BREACH OF THE IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING

46. Sunfield incorporates by reference the allegations set forth in paragraphs 1 through 45 as if set forth here in their entirety.

47. Sunfield entered into a contract with Sapphire that imposed upon Sapphire the implicit obligation of good faith and fair dealing toward Sunfield.

48. Sapphire violated that obligation of good faith and fair dealing by breaching the contract, in part by refusing to honor its purchase orders. Sapphire's actions have deprived Sunfield of the benefits of its contract. Accordingly, Sapphire is liable to Sunfield in the full amount of damages Sunfield has suffered, plus interest and any incidental and consequential damages arising from the breach..

WHEREFORE, Sunfield prays for judgment as follows:

A. On its First Claim for Relief, for damages in the amount of $142,367.27, plus incidental and consequential damages and pre-judgment and post-judgment interest for goods accepted and not paid for, and its lost profits to be determined at trial, plus incidental and consequential damages and pre-judgment and post-judgment interest for speakers and related inventory called for by purchase orders issued by Sapphire, which Sapphire then wrongfully refused to honor;

B. On its Second Claim for Relief, for damages in the amount of $31,462.94, plus incidental and consequential damages and pre-judgment and post-judgment interest;

B. On its Third Claim for Relief, for damages in an amount to be proven at trial, plus prejudgment and post-judgment interest;

C. On its Fourth Claim for Relief, for damages in an amount to be proven at trial, plus prejudgment and post-judgment interest;

D.      Awarding Sunfield its costs and attorneys' fees incurred here; and

E.      For such other and further relief as the Court may deem just and proper.

SUNFIELD ENTERPRISE CORPORATION,
By its attorneys,

October 27, 2005

_____
William R. Firth, III (DE Bar No. 4356)
EDWARDS & ANGELL, LLP
919 North Market Street, Suite 1500
Wilmington, DE 09801
302.777.7770 (Phone)
302.777.7263 (Fax)

-and-

Steven M. Cowley (B.B.O. No. 554534)
Jason L. Zanetti (B.B.O. No. 660580)
EDWARDS & ANGELL, LLP
101 Federal Street
Boston, MA 02110
(617) 439-4444