IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SUNFIELD ENTERPRISE CORPORATION,<br><br>        Plaintiff,<br><br>v.<br><br>SAPPHIRE AUDIO LLC<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  C.A. No. 05-CV-685<br>)<br>)  JURY TRIAL DEMANDED<br>)<br>)<br>) |

## AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS OF SAPPHIRE AUDIO LLC

Defendant Sapphire Audio LLC ("Sapphire"), in response to the Amended Complaint filed by Plaintiff Sunfield Enterprise Corporation ("Sunfield"), states as follows:

1. Sapphire is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 1.

2. Sapphire admits the allegations in paragraph 2.

3. Sapphire is without knowledge or information sufficient to form a belief as to the truth of the allegation in Paragraph 3 that "the parties' citizenship is diverse." Sapphire admits the allegation, stated in Paragraph 3, that "the amount in controversy exceeds $75,000, exclusive of interest and costs." The remaining allegations in Paragraph 3 set forth conclusions of law to which no response is required. To the extent that a response to those allegations is required, Sapphire denies them.

4. Sapphire admits the allegation, stated in Paragraph 4, that "it is a limited liability company organized under the laws of the State of Delaware." The remaining allegations in

1575882.1

Paragraph 4 set forth conclusions of law to which no response is required. To the extent that a response to those allegations is required, Sapphire denies them.

5. Sapphire denies the allegation, stated in Paragraph 5, that it is "a Delaware limited liability corporation." Further answering, Sapphire states that it is a Delaware limited liability company. The remaining allegations in Paragraph 5 set forth conclusions of law to which no response is required. To the extent that a response to those allegations is required, Sapphire denies them.

6. Sapphire admits the allegation, stated in Paragraph 6, that Sunfield "is a consumer electronics company." Sapphire is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations stated in Paragraph 6.

7. Sapphire admits the allegations in Paragraph 7.

8. Sapphire admits the allegations in the first sentence of Paragraph 8. Sapphire denies the allegations in the second sentence of Paragraph 8. Further answering, Sapphire states that Sapphire informed Sunfield of its intention to create an improved line of speakers (referred to hereafter as the "Mark 2 speakers") by replacing the printed circuit board ("pcb") with a new and improved printed circuit board ("the new pcb") and to modify its existing inventory of speakers with the installation of an "auxiliary pcb" to upgrade its existing inventory to a level of performance comparable to that of the new speakers with the new pcb's.

9. Sapphire denies the allegations in Paragraph 9. Further answering, Sapphire states that a Sapphire engineer worked with Sunfield, at Sunfield's facility, to build samples of the new and auxiliary pcb's.

10. Sapphire denies the allegations in Paragraph 10.

11. Sapphire denies the allegations in Paragraph 11.

12. Sapphire is without knowledge or information sufficient to form a belief as to the truth of the allegations stated in the first sentence of Paragraph 12. Sapphire denies the allegations stated in the second sentence of Paragraph 12.

13. Sapphire admits the allegation, stated in the first sentence of Paragraph 13, that "Sunfield manufactured additional speakers." Sapphire denies the remaining allegations in the first sentence of Paragraph 13. Sapphire admits the allegation, stated in the second sentence of Paragraph 13, that "Sapphire's personnel visited Sunfield's factory in Shenzhen, China from time to time, during the fall and winter of 2004 – 2005." Sapphire denies the remaining allegations in the second sentence of Paragraph 13. Further answering, Sapphire states that during their visits to Sunfield's factory during the fall and winter of 2004-2005, Sapphire personnel toured the factory and met with Sunfield personnel, but did not conduct testing or inspections of the speakers that Sunfield was manufacturing for Sapphire or for anyone else. Sapphire admits the allegation, stated in the third sentence of Paragraph 13, that "Sapphire did not identify any problem with Sunfield's design or manufacture of the speakers." Further answering, on the assumption that the phrase "in sections," as stated in the third sentence of Paragraph 13, was intended to be "inspections," Sapphire denies that its personnel undertook "inspections" of the speakers at Sunfield's factory in Shenzhen, China.

14. Sapphire admits the allegations in Paragraph 14.

15. Sapphire is without knowledge or information sufficient to form a belief as to what Sunfield's reference to "the ten pilot samples" in the first sentence of Paragraph 15 is meant to refer to, and therefore cannot form a belief as to the truth of the allegation made thereby. Further answering, Sapphire states that on or about July 12, 2004, it issued a purchase order to Sunfield for twenty samples of the Mark 2 speakers; that Sunfield appears to have shipped those

twenty samples to Sapphire on or about September 20, 2004; and that Sapphire subsequently received those twenty samples. Further answering, Sapphire states that it is without knowledge or information sufficient to form a belief as to whether Sunfield sent the samples to Sapphire "for its approval." To the extent that the allegations stated in the second sentence of Paragraph 15 refer to the twenty sample Mark 2 speakers ordered by Sapphire on or about July 12, 2004, and received by Sapphire some time after September 20, 2004, Sapphire admits the allegation that it "did not raise any question as to defects with the samples and issued purchase orders to Sunfield." Sapphire is without knowledge or information sufficient to form a belief as to what Sunfield means by the phrase "immediately thereafter," as stated in the second sentence of Paragraph 15, and therefore cannot form a belief as to the truth of the allegation made thereby. Sapphire is without knowledge or information sufficient to form a belief as to the truth of the allegations stated in the third sentence of Paragraph 15.

16. Sapphire is without knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 16. Sapphire admits the allegations in the second sentence of Paragraph 16. Further answering, Sapphire states that SGS inspected the speakers by testing them against a defective sample provided to SGS by Sunfield. Sapphire denies the allegations in the third sentence of Paragraph 16. With respect to the allegations in the fourth sentence of Paragraph 16, Sapphire admits that it accepted and paid for speakers shipped in or about October 2004, but states that it is without knowledge or information sufficient to form a belief as to the truth of the allegation that those speakers were shipped on October 8, 2004.

17. Sapphire denies the allegations in the first sentence of Paragraph 17. Further answering, Sapphire states that, during the fall and winter of 2004-2005, it issued purchase

orders for correctly-manufactured Mark 2 speakers. The second sentence of Paragraph 17 characterizes and purports to restate the terms of a document, which speaks for itself, that is attached to the Amended Complaint as Exhibit A, and which apparently was created by Sunfield for purposes of this litigation. Sapphire denies the characterization of Exhibit A as "listing . . . the amounts due from Sapphire . . . ."

18. Sapphire denies the allegations in the first sentence of Paragraph 18. Sapphire is without knowledge or information sufficient to form a belief as to the truth of the allegations stated in the second sentence of Paragraph 18. Further answering, Sapphire states that the documents attached to the Amended Complaint as Exhibit B appear to be incomplete and, further, are confusingly arranged such that, for example, "Page 1" of the first report is followed by what appears to be a duplicate of that page, which page is in turn followed by "Page 2" of an entirely different report. In light of this confused and confusing presentation of the documents in Exhibit B, Sapphire is unable to form a belief as to the truth of the allegation, stated in the third sentence of Paragraph 18, that Sapphire received copies of the particular documents included in Exhibit B. Further answering, Sapphire admits that it did receive copies of inspection reports from SGS prior to, or at the time of, the shipment of speakers to Sapphire. Further answering, Sapphire is unable to find a single report attached as part of Exhibit B containing the words "no defect" to describe complete inspection results.

19. Sapphire denies the allegations in Paragraph 19.

20. Sapphire admits that, by email from Wayne Threatt of Sapphire to Peter Peng of Sunfield dated May 18, 2005, Sapphire stated an objection to the design and manufacture of speakers that had been shipped to it by Sunfield. The basis for Sapphire's objection is set forth in the email, which is a written document and speaks for itself. Sapphire denies the allegations

set forth in Paragraph 20 to the extent that they seek to vary or improperly paraphrase the terms of that document.

21. Sapphire denies the allegations in Paragraph 21.

22. Sapphire denies the allegations in Paragraph 22.

23. Sapphire denies the allegations in the first and third sentences of Paragraph 23. The remaining allegations in Paragraph 23 purport to restate communications from Sunfield to Sapphire that are embodied in an email from Peter Peng of Sunfield to Wayne Threatt of Sapphire dated May 18, 2005, which is a written document and speaks for itself. Sapphire denies those allegations to the extent that they seek to vary or improperly paraphrase the terms of that document.

24. Sapphire admits that, by email from Brett Frank of Sunfield to Wayne Threatt of Sapphire, Sunfield communicated with Sapphire concerning repair of the defective speakers manufactured by Sunfield. The contents of that communication are set forth in the email, which is a written document and speaks for itself. Sapphire denies the allegations set forth in Paragraph 24 to the extent that they seek to vary or improperly paraphrase the terms of that document.

25. Sapphire admits that, by email dated May 23, 2005, from Brett Frank of Sunfield to Wayne Threatt of Sapphire, Sunfield communicated with Sapphire concerning accounts receivable. The contents of that communication are set forth in the email, which is a written document and speaks for itself. Sapphire denies the allegations set forth in Paragraph 25 to the extent that they seek to vary or improperly paraphrase the terms of that document. Further answering, Sapphire denies that "the product" referred to in Paragraph 25 "was inspected, accepted, shipped, and received without rejection by Sapphire."

26. Sapphire admits that on or about May 23 and 24, 2005, in a series of emails exchanged by Brett Frank of Sunfield and Wayne Threatt of Sapphire, the parties communicated with each other concerning repair of the defective speakers manufactured by Sunfield. The contents of those communications are set forth in the emails, which are written documents and speak for themselves. Sapphire denies the allegations set forth in Paragraph 26 to the extent that they seek to vary or improperly paraphrase the terms of those documents.

27. Sapphire denies the allegations in Paragraph 27.

28. Sapphire admits that in April and May of 2005, Sunfield sent Sapphire invoices amounting to a total of $142,367.27 for speakers inspected by SGS and shipped to Sapphire, and for which Sapphire has refused to pay. Sapphire denies that it accepted those speakers.

29. Sapphire is without knowledge or information sufficient to form a belief as to the truth of the allegations stated in the first and third sentences of Paragraph 29. Sapphire denies the allegations stated in the second sentence of Paragraph 29.

30. Sapphire denies the allegations in Paragraph 30.

31. Sapphire admits the allegations in Paragraph 31.

32. Sapphire admits that Sunfield manufactured pilot samples, but denies that those samples conformed to Sapphire's specifications. Sapphire denies the allegations in the second sentence of Paragraph 32.

33. Sapphire admits the allegations in the first sentence of Paragraph 33. Sapphire denies the allegations in the second sentence of Paragraph 33. Sapphire is without knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of Paragraph 33.

34. Sapphire denies the allegations in Paragraph 34.

-7-

1575882.1

## COUNT I
### (Breach of Contract (Speakers))

35.  Sapphire restates and incorporates the statements in Paragraphs 1-34 as if fully set forth herein.

36.  Paragraph 36 sets forth conclusions of law to which no response is required. To the extent that a response is required, Sapphire denies the allegations in Paragraph 36.

37.  Paragraph 37 sets forth conclusions of law to which no response is required. To the extent that a response is required, Sapphire denies the allegations in Paragraph 37.

38.  Sapphire denies the allegations in Paragraph 38.

39.  Paragraph 39 sets forth conclusions of law to which no response is required. To the extent that a response is required, Sapphire denies the allegations in Paragraph 39.

## COUNT II
### (Breach of Contract (Subwoofers and Related Stock))

40.  Sapphire restates and incorporates the statements in Paragraphs 1-39 as if fully set forth herein.

41.  Paragraph 41 sets forth conclusions of law to which no response is required. To the extent that a response is required, Sapphire denies the allegations in paragraph 41.

42.  Sapphire denies the allegations in Paragraph 42.

43.  Sapphire denies the allegations in Paragraph 43.

## COUNT III
### (Unjust Enrichment)

44.  Sapphire restates and incorporates the statements in Paragraphs 1-43 as if fully set forth herein.

45.  Paragraph 45 sets forth conclusions of law to which no response is required. To the extent that a response is required, Sapphire denies the allegations in paragraph 45.

## COUNT IV
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

46. Sapphire restates and incorporates the statements in Paragraphs 1-45 as if fully set forth herein.

47. Sapphire admits that it entered into a contract with Sunfield, and that the contract imposed on both parties an implicit obligation of good faith and fair dealing. Further answering, to the extent that the allegations in Paragraph 47 suggest that the obligation of good faith and fair dealing was owed unilaterally by Sapphire to Sunfield, Sapphire denies them.

48. Paragraph 48 sets forth conclusions of law to which no response is required. To the extent that a response is required, Sapphire denies the allegations in paragraph 48.

## AFFIRMATIVE DEFENSES

1. Sunfield fails to state a claim upon which relief can be granted in Count III (unjust enrichment) because the parties' rights with respect to the subject matter of the claim are set forth and governed by the terms of a contract.

2. Sunfield fails to state a claim upon which relief can be granted in Count IV (breach of the covenant of good faith and fair dealing) because there is no allegation that Sapphire acted with dishonest purpose, consciousness of wrong, or ill will in the nature of fraud, as the cause of action requires.

3. Sunfield's claims are barred, in whole or in part, by the doctrines of estoppel and/or waiver.

4. Sunfield's claims for equitable relief are barred by the doctrine of unclean hands.

5. Alternatively, and without an admission of any kind, Sunfield failed to mitigate any damages that it may have suffered.

6. Alternatively, and without an admission of any kind, any damages that Sunfield may have suffered, and that were actually and proximately caused by any act(s) or omission(s) on the part of Sapphire, are subject to avoidance and/or set-off equal to the full amount of the damages that Sapphire has suffered due to Sunfield's breaches of contract, warranty, and other legal and equitable obligations owed to Sapphire.

7. Alternatively, and without admission of any kind, any damages that Sunfield may have suffered were caused in whole or in part by the acts or omissions of Sunfield itself, and therefore Sunfield is not entitled to any recovery or, alternatively, the amount of any such recovery must be reduced by the degree of Sunfield's responsibility.

8. Sunfield's damages, if any, were caused by the acts or omissions of third parties for whose conduct Sapphire is not responsible.

## COUNTERCLAIMS

1. Defendant/Counterclaim-Plaintiff Sapphire Audio LLC ("Sapphire") is a limited liability company organized under the laws of Delaware, with its principal place of business in Boston, Massachusetts.

2. Plaintiff/Counterclaim-Defendant Sunfield Enterprise Corporation ("Sunfield") has alleged that it is a Taiwanese company with its principal place of business in the Shenzhen area of China.

3. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because the parties' citizenship is diverse, and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

4. This Court has personal jurisdiction over Sunfield because Sunfield has purposefully availed itself of the forum by filing its Complaint in this Court.

5.  Sapphire is a supplier of home entertainment products, including speakers, to the consumer market place.

6.  Sunfield has alleged that it is a consumer electronics company that primarily manufactures speakers for the consumer market place.

7.  As of April 2004, Sapphire had purchased Sunfield-manufactured speakers from Sunfield.

8.  In April 2004, Sapphire informed Sunfield of its desire to improve the performance of one of its Sunfield-manufactured lines of speakers by, among other things, replacing the printed circuit board (the "old pcb") used in the speakers with an improved pcb (the "new pcb").

9.  In May 2004, Sapphire asked Sunfield to manufacture and ship to Sapphire a different pcb (referred to hereafter as an "auxiliary pcb"). Sapphire ordered the auxiliary pcb's for the purpose of wiring them to the old pcb's installed in the Sunfield-manufactured speakers already in Sapphire's warehouses, so that those speakers would provide the same enhanced performance as the speakers containing the new pcb's (referred to hereafter as the "Mark 2 speakers") that Sapphire had asked Sunfield to manufacture.

10. Sapphire provided Sunfield with detailed schematics and a "Manufacturing Engineering Memo" explaining the pcb modifications and how to perform them.

11. In the summer of 2004, Sunfield produced samples of the new and auxiliary pcb's. Aaron Fournier, a Sapphire engineer, traveled to Sunfield's factory in China, inspected those samples, and confirmed that they had been manufactured in accordance with Sapphire's instructions.

12. In September 2004, Sapphire placed an initial order with Sunfield for Mark 2 speakers. Sunfield shipped speakers in response to the order and, in October 2004, Sapphire received those speakers at its warehouse in Massachusetts. Sapphire paid Sunfield for those speakers, and ordered from Sunfield additional Mark 2 speakers.

13. In July 2004, Sapphire placed an order with Sunfield for auxiliary pcb's. Sunfield shipped the auxiliary pcb's, and, in August 2004, Sapphire received the auxiliary pcb's at its warehouse in Massachusetts. Sapphire paid Sunfield for the auxiliary pcb's and wired them to the old pcb's in Sunfield-manufactured speakers that Sapphire had received from Sunfield before ordering the Mark 2 speakers, and that were already in Sapphire's warehouse.

14. During the fall of 2004, the winter of 2004-2005, and the spring of 2005, Sapphire continued to order Mark 2 speakers from Sunfield. Sunfield shipped speakers to Sapphire in response to those orders. Sapphire paid Sunfield for all of the Mark 2 speakers that it ordered through March 2005.

15. In or about May 2005, Sapphire discovered that Sunfield had manufactured the Mark 2 speakers incorrectly, by wiring the auxiliary pcb's to the tweeter rather than the midrange driver. Sunfield's error caused the speakers to undergo a severe dip in frequency response centered at 7000 hertz (Hz) – thus rendering them defective.

16. By email dated May 18, 2005, Sapphire notified Sunfield of the defect in the Sunfield-manufactured speakers.

17. Sunfield responded, by email dated May 18, 2005. In that email, Sunfield acknowledged that "it was our mistake that lead [sic] to this problem."

18. In an email dated May 18, 2005, Sapphire proposed a means of fixing the defect, First, Sunfield would provide Sapphire with "upgrade crossovers," which Sapphire would then

arrange to have installed in the defective Sunfield-manufactured speakers already received by Sapphire in the United States. Second, with respect to Sunfield-manufactured speakers then in transit from China to the United States, Sapphire would cause those speakers to be returned upon their arrival in the United States to Sunfield's factory in China, for repair there by Sunfield.

19. In emails dated May 19, 2005 and May 22, 2005, Sunfield agreed with Sapphire's proposal. In addition, Sunfield proposed that the two companies should "agree to split the cost of this rework," and further that Sunfield would "provide engineering and quality personnel to manage the rework in the US." In addition, Sunfield stated that the "upgrade crossovers" needed to perform the repairs would be available in ten days.

20. Sunfield first expressed reservations about the repair solution proposed by Sapphire, and agreed to by Sunfield, on May 23, 2005. In an email of that date to Wayne Threatt of Sapphire (among others), Sunfield's Brett Frank estimated that the total cost of performing the repairs in the United States would be "well over $100,000!" Mr. Frank further stated that "[w]e must try and find a better financial solution"; proposed (for the first time) that Sapphire "return[] as much stock as possible to Sunfield where we can cover the cost of the rework"; and asked Mr. Threatt to "offer exact details of what you have in mind for a solution."

21. By email dated May 23, 2005, Sapphire's Mr. Threatt offered the solution that Sapphire had in mind: (1) Sapphire's main customer, Tweeter, would begin repairing the defective Sunfield-manufactured speakers in its possession as soon as it received from Sunfield the upgrade crossovers needed to perform the repairs; (2) Sapphire would return a subset of the defective Sunfield-manufactured speakers (the "SCMKII" speakers) to Sunfield for repair in China; and (3) Sapphire would repair the remaining Sunfield-manufactured defective speakers in its inventory at Sapphire's warehouse in the United States. Mr. Threatt explained that this

proposal was, in Sapphire's view, the most cost-effective way of addressing the problem while ensuring that the defective speakers for sale at Tweeter would be repaired and ready for sale to the public quickly – which, as Mr. Threatt further noted, was "critical for the long [term] health of the business" and "is good for both of us."

22. On May 24, 2005, Sunfield rejected Sapphire's proposal and stated that Sunfield would pay to repair only those defective Sunfield-manufactured speakers that (a) were either in customs or in transit to the United States, and (b) Sapphire could fit into shipping containers (then in transit to the United States) after "remov[ing] any good products from these containers." As a precondition to this offer, however, Sunfield insisted that Sapphire "will immediately pay for the dead stock caused by the cancellation of the PS-5 and PS-7 [subwoofers] and offer [a] letter of intent to use within a fixed time . . . the dead stock caused by the reduction in the PO for the PS-3 [subwoofer]."

23. By email to Sunfield's Mr. Frank, dated May 24, 2005, Mr. Threatt of Sapphire proposed that the parties split equally the total cost of the repairs made necessary by Sunfield's defective manufacture of the speakers. By email to Mr. Threatt dated May 25, 2005, Mr. Frank of Sunfield rejected that proposal and reported that David Kao, Sunfield's president, had ordered the Sunfield team "to STOP everything until all problem solved [sic]."

24. On or about May 26, 2005, Sapphire learned that Sunfield had refused to accept delivery of certain defective Sunfield manufactured speakers that had been in transit to the United States when Sapphire had notified Sunfield of its manufacturing error, and that Sapphire had rejected. Those speakers were returned to Sapphire and held at its warehouse in the United States.

1575882.1

25. By email dated June 1, 2005, Sunfield's Peter Peng informed Mr. Threatt of Sapphire that Sunfield would not provide the upgrade crossovers needed to repair the defective Sunfield-manufactured speakers unless and until Sapphire (among other things) paid Sunfield for all of the defective speakers that it had not already paid for.

26. Sapphire rejected Peng's demand, and subsequently was able to obtain the required upgrade crossovers from another vendor and begin repairing the defective Sunfield-manufactured speakers – but only after a delay of several weeks.

27. Sapphire has been able to repair almost all of the defective Sunfield-manufactured speakers. The cost of those repairs to date is approximately $95,000.

28. As a direct and proximate result of the events described above, Sapphire was driven from the speaker market for a period of several months and, in addition, has suffered considerable harm to its reputation as a speaker manufacturer, and to its ability to compete in the speaker market. Sapphire anticipates that it will be unable to recover from the damage it has suffered due to these events, and that it will have to abandon the speaker business as a result.

## COUNT I
### (Breach of Contract)

29. Sapphire restates and incorporates the statements in Paragraphs 1-28 as if fully set forth herein.

30. Sapphire and Sunfield entered into a contract whereby Sunfield agreed to manufacture for Sapphire Mark 2 audio speakers containing pcb's manufactured and installed in accordance with Sapphire's specifications.

31. Sunfield failed to provide Sapphire with Mark 2 audio speakers containing pcb's manufactured and installed in accordance with Sapphire's specifications.

1575882.1

32.     Instead, Sunfield provided Sapphire with audio speakers containing pcb's that had not been manufactured and installed in accordance with Sapphire's specifications, thus causing the speakers to be defective and non-conforming.

33.     As a direct and proximate consequence of Sunfield's breach of its contractual obligations, Sapphire has suffered damages, including incidental and consequential damages, for which Sunfield is liable, in an amount to be determined at trial.

## COUNT II
### (Breach of Warranty)

34.     Sapphire restates and incorporates the statements in Paragraphs 1-33 as if fully set forth herein.

35.     Sapphire and Sunfield entered into a contract whereby Sunfield agreed to manufacture audio speakers for Sapphire.

36.     Sunfield is and, at all times relevant to this action, was a merchant with respect to the audio speakers that it sold to Sapphire.

37.     The contract between Sapphire and Sunfield included an implied warranty that the goods at issue – *i.e.*, the audio speakers – were fit for the ordinary purposes for which such goods are used.

38.     Sunfield breached this implied warranty by selling and delivering to Sapphire audio speakers that were not fit for the ordinary purpose for which such goods are used.

39.     As a direct and proximate consequence of Sunfield's breach of the implied warranty, Sapphire has suffered damages, including incidental and consequential damages, for which Sunfield is liable, in an amount to be determined at trial.

1575882.1

*WHEREFORE*, Defendant Sapphire Audio LLC respectfully requests (1) that Plaintiff Sunfield Enterprise Corporation's Amended Complaint be dismissed with prejudice, with costs assessed against Sunfield, (2) that the Court award judgment to Sapphire on its Counterclaims for damages (including incidental and consequential damages) in an amount to be determined at trial, plus prejudgment and postjudgment interest, and (3) that the Court grant such other and further relief to Sapphire as to it may seem just and proper.

**MORRIS, NICHOLS, ARSHT & TUNNELL**

*/s/ William O. Lamotte III*
William O. LaMotte III (#460)
MORRIS, NICHOLS, ARSHT & TUNNELL
1201 North Market Street
18th Floor
P. O. Box 1347
Wilmington, DE 19899
(302) 658-9200

- and -

Thomas J. Sartory (admitted *pro hac vice*)
Patrick M. Curran, Jr. (admitted *pro hac vice*)
GOULSTON & STORRS, P.C.
400 Atlantic Avenue
Boston, MA  02110-3333
Tel. (617) 482-1776
Fax. (617) 574-7538

Attorneys for Defendant Sapphire Audio LLC

Dated:  March 10, 2006

1575882.1